CURRIE and CURRIE *v.* HART and others.

A general assignment executed by an insolvent debtor, to his brother, who at the
time was unfit to attend to business by reason of a lingering disease, which the
assignor believed was incurable and of which he died ; was held for that cause to
be fraudulent and void as against creditors.

The selection of such an assignee furnishes strong presumption of an intent on the
part of the assignor to keep the control and disposal of the property.

The assigned property was almost wholly fees earned in the office of sheriff.
The assignor's deputy continued to receive and collect the same after the assign-
ment, and to dispose of them as he had done previously, except that he paid over
to the assignor only upon the assignee's direction. This was held to be evidence
of fraud in the assignment.

So of an understanding that the assignee should allow to the assignor a weekly sum
for his services, the same being nominal.

An assignment by a sheriff of fees due and to become due, having for one of its ob-
jects an indemnity of his sureties against future misappropriation of monies which
should be collected on executions, is void.

Whether an assignment of future fees by a sheriff, for the benefit of creditors would
be valid? *Quære.*

Jan. 9, Feb. 1 ; Feb. 22, 1845.

THE bill was filed on the 23d day of August, 1842, against
Monmouth B. Hart, on the return of an execution unsatisfied;
to reach his equitable interests and things in action.

. In his answer the defendant set up the execution by him of
a general assignment to James H. Hart, for the benefit of his
creditors, dated May 10, 1842, and delivered June 10, 1842.

The complainants on the 24th of February, 1843, filed a sup-
plemental bill making James H. Hart a party defendant, and
charging that the assignment was fraudulent and void against
them as creditors of M. B. Hart. J. H. Hart put in an answer on
the 3d of June, previous to which he had at his own request been
removed from the trust as assignee, and Cornelius Bergen ap-
pointed in his stead by an order of this court dated May 31, 1843.

On the 24th of October, 1843, a second supplemental bill was
filed, making Bergen a party. The suit was brought to a hear-
ing on the pleadings and proofs.

It appeared that M. B. Hart was the sheriff of the city and
county of New York for three years, commencing on the 1st day

of January, 1841; and C. Bergen was one of the sureties in his official bond.

The assignment to James H. Hart embraced all M. B. Hart's property and effects, including the debts due to him as sheriff, with all the future receipts of the office of sheriff. Its trusts were, *first*, to pay demands against him as sheriff thereafter to be incurred, and such as should accrue against him and his sureties in his official bond. *Second*, to pay all the demands for which James H. Hart was liable for him as indorser or otherwise. *Third*, to pay $4200 of borrowed money to Benjamin F. Hart. And *fourth*, to pay all the other creditors of M. B. Hart, rateably.

The other material facts will be found stated in the opinion of the court.

*G. Buckham* and *J. W. Gerard*, for the complainants.

*J. C. Hart*, for the defendant M. B. Hart.

*W. Rockwell* and *D. B. Tallmadge*, for C. Bergen.

THE ASSISTANT VICE-CHANCELLOR.—I doubt very much whether any interest passed to James H. Hart, the assignee, in the future credits and receipts which were expected to accrue in the sheriff's office, after the date of the assignment. The effect of such instruments, when they operate by way of agreement or estoppel, (see *Wright* v. *Wright*, 1 Ves. Sen. 409,) would probably be limited and restricted, so as to cease whenever they came in conflict with the equitable lien or priority of a creditor's bill against the assignor. This point, and the grave questions of public policy which are presented by an assignment of a sheriff's whole official fees which are thereafter to accrue, are of so much importance, as well as difficulty, that I prefer to leave them to the decision of judges who will do them better justice than I can ; if there are other grounds upon which this case can be determined.

In respect of the sheriff's fees which had accrued when the assignment was made, they are like debts due to any other individual.

I will examine the objections to the assignment, as applicable to those fees.

FIRST. The general terms used in declaring the second trust, render its validity questionable. They provide for discharging all legal demands and liabilities which might thereafter be incurred, in and about the management and discharge of the duties of the assignor as sheriff, and all legal claims upon the office or against him as sheriff, which might thereafter arise, &c. &c.

It appears by the testimony, that claims of this character frequently arose, both before and after the assignment, in consequence of the assignor's omission to pay over monies collected by him on executions. This class of claims was of course founded upon a plain violation of his official duty; and an assignment made in contemplation of such official misconduct, and intended to secure the sheriff's sureties from its consequences, would in my opinion, be void. The trust in this instrument is sufficiently broad to include such claims, and was sustained at the hearing as properly and justly applicable to them. It would perhaps, be too harsh to avoid it because it may include a void preference, when there is no expression of a design to provide for such a preference.

But after reading the testimony of the under-sheriff and the coroner, it is difficult to resist the conclusion that this species of claim was a prominent consideration and motive for making the assignment. And if it were, I think, the object being unlawful, the trusts could not be upheld.

I will waive this point, and proceed to the other objections made by the complainants.

SECOND. The selection of the assignee, is one of the alleged evidences of a fraudulent intent in making the assignment.

The assignment was executed on the 10th of June, 1842. It bears date a month earlier, but I find no evidence that it was drawn up prior to that day.

It is proved by a letter of M. B. Hart, dated 21st June, 1842, (which is proper testimony, as he was then in possession of the assigned effects;) that Doctor Hart, the assignee, had been confined to his bed and room for fifteen days, with a disorder which the physicians declared to be a decline or consumption. The let-

ter shows that M. B. Hart did not believe that his brother would ever recover, and that his only hope was in his brother's going to Rio Janeiro to spend the ensuing winter. He says in the letter, that he has determined to make an assignment to the doctor of all fees, &c., as if the assignment had not then been executed ; but as the case stands, the date of its delivery was the 10th of June.

It also appears that Doctor Hart never recovered from the attack mentioned in the letter, which was consumption ; and that he was never afterwards able to attend to business to any extent deserving of mention.

This is the case therefore of an insolvent debtor making an assignment in trust for creditors of all his property, and even of his future expectations, to a brother, who as he knows is prostrate with a disease which he believes is incurable ; and knowing also that if curable, it will for a year to come, entirely prevent him from giving any personal attention to the discharge of the duties of assignee.

In *Reed* v. *Emery*, 8 Paige, 417, the Chancellor decided that an assignment by a debtor in failing circumstances to an assignee who is known to be insolvent, is *prima facie* evidence of an intent to defraud the creditors of the assignor, and sufficient to overcome the general denial of fraud in the answer.

In *Cram* v. *Mitchell*, (January 27th, 1844,)(*a*) I decided the same point upon an assignment made to three near relatives, all of whom were preferred creditors; one of the assignees being stone blind, another too illiterate to write and scarcely able to read, and the third residing at so great a distance from the property and residence of the assignor, that he could not devote his attention to it, and instead of that, appointed an agent on the spot to look after his interests as a creditor.

The selection of such assignees, furnishes strong presumption of an intent on the part of the assignor, to keep the control of his property in his own hands and under his own disposal. This is the natural and inevitable result, when the assignor is

(*a*) Reported in 1 Sandford's Ch. R. 251.

physically or mentally incompetent to act efficiently, as well as where his distance from the scene of action precludes his personal care and supervision.

On this ground, I am persuaded that the assignment in question is fraudulent as against the creditors of M. B. Hart.

THIRD. The management of the assigned property is the next point made against the assignment.

The property consisted almost exclusively of the fees earned, and to be earned, in the sheriff's office.

It appears by the testimony that for nearly eleven months after the transfer of the property, there was no change whatever in the custody and control of those things in action, or in the receipt of such as were paid. During all this period, the under-sheriff, who attended in the office and had the charge there during Mr. Hart's whole term, received all the monies paid in for fees and services. He received them as such under-sheriff, and not as agent or in behalf of the assignee; and he paid them out and disposed of them precisely as he had done before the assignment was made, except that he says what he paid over to the sheriff himself was so paid by J. H. Hart's direction. This merely aggravates the apparent fraud, for it shows that the assignee's only active interference was to place money in the assignor's hands in contravention of his duty as trustee. The reason assigned for the assignee's omission to take possession, is its intrinsic difficulty, and his continued ill health. The difficulty is all imaginary, provided the assignment were made in good faith. A clerk placed in the office, a notice to the deputies and the under-sheriff, and to the indebted attorneys; renewed from time to time in respect of the accruing fees, would have answered the purpose.

The ill health of the assignee, if it had been wholly unforseen, would have obviated the inference arising from his personal inattention; but would not excuse the total omission to act through others. And this omission, coupled with the assignor's knowledge of the situation of his brother when he made the transfer, furnishes presumptive evidence that he made it with the intent to hinder and delay his creditors.

In reference to the household furniture, &c. assigned, it then was and has ever since been, in the possession of M. B. Hart.

An execution would probably have been upheld against all the claims interposed to protect it ; but the requisite parties are wanting to warrant me in deciding that question.

I do not think that the voluntary assignee could have held these chattels, against the mortgage and the executions which were charges upon them. His omission to interfere, therefore does not furnish any evidence of a fraudulent intent.

FOURTH. There is one other circumstance which deserves notice.

Mr. Hart's son testifies that Mr. H. received from the assignee, ten dollars a week for his services, up to the time his term of office expired.

If the assignment were valid to pass the earnings of the office after its date, these payments were made to the assignor wholly out of the fund he had set apart for his creditors. His services, so far as it is proved, consisted of his official title and dignity as sheriff and of nothing more.

Watkins, who in May, 1843, enacted the part of receiver under J. H. Hart, also paid out money on M. B. Hart's orders drawn upon the under-sheriff.

And in his examination before the master under the order for a receiver in this suit, M. B. Hart testified that J. H. Hart allowed him to draw from the fees of the office, sufficient for the support of his family, in compensation for his services ; and that his salary was fixed at $2000 a year, but he had not drawn out at any thing like that rate. This examinatian was in March, 1843, while M. B. Hart continued in possession of the things in action assigned, and it must be received as competent testimony against the assignee.

The result of the evidence on this head, clearly shows, that although not expressed in the instrument, it was understood and agreed when the assignment was made, that the assignor should receive his support out of the effects assigned.

This of itself, is sufficient to establish an intent fraudulent towards creditors.

I have not adverted to the course of things after the 1st of May, 1843.

The receivership of Watkins, during that month of May, was

really absurd. He received some monies from the under-sheriff, and paid them out, principally as directed by him; without apparently knowing why he received or paid them. It is plain that he did not succeed in learning much about the assigned property, or in getting any control over it.

After Mr. Bergen became the trustee, matters undoubtedly assumed a different aspect. But the change came too late to efface the indelible badges of fraud which had been stamped upon the assignment by the circumstances which I have considered and detailed.

It is impossible for me, upon the evidence to resist the conclusion that this assignment was intended to hinder, delay or defraud creditors; and it must be declared to be void against the complainants accordingly.

They are entitled to a decree for the payment of their debt, interest and costs, out of the fund upon which they obtained a lien by their bill.